**David HIPP, Brad Stein, Mike Stell, and All Others Similarly Situated, Plaintiffs,**

v.

**LIBERTY NATIONAL LIFE INSURANCE COMPANY, Defendant.**

**No. 95–1332–CIV–T–17A.**

United States District Court, M.D. Florida, Tampa Division.

Aug. 15, 1999.

See also, 29 F.Supp.2d 1314, and 39 F.Supp.2d 1359.

Ross Mathew Goodman, Robert Douglas Permenter, Troy Alan Rafferty, Mary E. Pilcher, Levin, Middlebrooks, Thomas, Mitchell, Green, Eschner, Proctor & Papantonio, Pensacola, FL, for David Hipp, Brad Stein, plaintiffs.

Ross Mathew Goodman, Levin, Middlebrooks, Thomas, Mitchell, Green, Eschner, Proctor & Papantonio, Pensacola, FL, for Mike Stell.

Ross Mathew Goodman, Troy Alan Rafferty, Levin, Middlebrooks, Thomas, Mitchell, Green, Eschner, Proctor & Papantonio, Pensacola, FL, for James W. Lee, Peter Swanson,

Ross Mathew Goodman, Troy Alan Rafferty, Mary E. Pilcher, Levin, Middlebrooks, Thomas, Mitchell, Green, Eschner, Proctor & Papantonio, Pensacola, FL, for Kenneth Blake Tuggle, Sr., Dwayne E. Sentell, Harold Dee Carter, James Donald Ganus, Carl Anthony Agee.

Peter W. Zinober, D. Michael Pointer, II, Zinober & McCrea, P.A., Tampa, FL, Martha C. Perrin, Gregory J. Hare, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, GA, William J. Baxley, Joel E. Dillard, Baxley, Dillard, Dauphin & McKnight, P.A., Birmingham, FL, Margaret H. Campbell, Atlanta, GA, for Liberty National Life Insurance Co., defendant.

## ORDER

KOVACHEVICH, Chief Judge.

This cause comes before the Court on the following:

1. Plaintiffs' motion for attorneys' fees and supporting memorandum (Docket Nos. 391–392), filed March 29, 1999; and Defendant's response (Docket No. 401), filed April 12, 1999;

2. Defendant's motion for remittitur or for a new trial on the issue of damages and supporting memorandum (Docket No. 392–393), filed March 31, 1999; and Plaintiffs' response (Docket No. 406), filed May 4, 1999; and

3. Defendant's motion for judgment as a matter of law or for a new trial and supporting memorandum (Docket No. 394–395), filed March 31, 1999; and Plaintiffs' response (Docket No. 407), filed May 4, 1999.

1. Motion for Costs and Attorneys' Fees (Docket No. 391)

Plaintiffs move for an award of their costs and attorneys' fees, pursuant to 29 U.S.C. Sections 216(b) and 626(b) and, with respect to the Florida Plaintiffs, Section 760.11(5), Florida Statutes. However, in the time since Plaintiff's motion for costs and attorneys' fees was filed, the Defendant has filed multiple post-trial motions, as well as a notice of appeal. Responding to the post-trial motions has obviously entailed the expenditure of a great deal of attorney time, and, most likely, the incurrence of further costs as well. Responding to the appeal will add further to this total. Moreover, the outcome of the appeal could affect whether some or all of the Plaintiffs are entitled to an award of costs and attorneys' fees. In the interests of judicial economy, the Court will therefore defer ruling on costs and attorneys' fees until all appeals have been resolved.

II. Motion for Judgment as a Matter of Law, or, Alternatively, for a New Trial on Liability (Docket No. 395)

The Defendant argues that it is entitled to judgment as a matter of law or a new trial on several grounds:

(1) judgment as a matter of law with respect to the claims of Plaintiffs Lee, Agee, Carter, and Tuggle on the grounds that a collective action was improper in this case, and that those Plaintiffs' claims arose outside of the appropriate temporal and subject matter scope for inclusion in this case; and, on that basis, a new trial with respect to the claims of Plaintiffs Hipp, Stein, and Stell, because the inclusion of evidence on the claims of the improperly included

Plaintiffs prejudiced the Defendant with regard to the claims of the properly included Plaintiffs;

(2) judgment as a matter of law with regard to the Plaintiffs' pattern and practice claims, because the testimony presented was not sufficient to establish a pattern and practice of discrimination, and because the Plaintiffs did not provide statistical evidence in support of that claim;

(3) judgment as a matter of law on each of the Plaintiffs' claims, because, assuming that Plaintiffs did not establish that there was a pattern and practice of discrimination, each Plaintiff did not present sufficient evidence individually to support his claim;

(4) a new trial on each of the Plaintiffs' claims because the Court refused to give certain jury instructions;

(5) a new trial on each of the Plaintiffs' claims, because the jury heard evidence that was time-barred, evidence of discrimination against others, and evidence of stray remarks;

(6) judgment as a matter of law on the jury's liquidated damages, punitive damages, and pain and suffering verdicts, because those verdicts were not supported by substantial evidence;

(7) a new trial or remittitur on the award of backpay, because the reports prepared by Plaintiffs' expert witness were unreliable.

 Most of these issues have already been addressed by the Court at least once, if not several times, making the Defendant's motion on those issues essentially motions to reconsider. A motion for reconsideration must demonstrate why the court should reconsider its prior decision and "set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Cover v. Wal–Mart Stores, Inc.*, 148 F.R.D. 294, 294 (M.D.Fla.1993). As such, a motion to reconsider should raise new issues, not merely readdress issues previously litigat-

ed. Courts have recognized three (3) grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice. *See Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981). This Court will not reconsider a previous ruling when the party's motion fails to raise new issues and, instead, only relitigates what has already been found lacking. *See Government Personnel Serv., Inc. v. Government Personnel Mut. Life Ins. Co.*, 759 F.Supp. 792, 793 (M.D.Fla.1991), aff'd, 986 F.2d 506 (11th Cir.1993).

Here, the Defendant has presented neither new argument nor new authority on these issues, and has not persuaded the Court that either clear error or manifest injustice exists. The Court will discuss each of the arguments raised by the Defendant in its motion in order to ensure the clarity of the record. However, the Court will not retread ground it has already covered.

 In considering a motion for judgment as a matter of law, a district court must consider the evidence "in the light most favorable to, and with all reasonable inferences drawn in favor of, the non-moving party." *Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir.1999) (quoting *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1555 (11th Cir.1995)); *see also, General American Life Ins. Co. v. AmSouth Bank*, 100 F.3d 893, 899 (11th Cir.1996); *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir.1996). "A party is entitled to judgment as a matter of law only if the evidence and inferences derived from the evidence are so strong that reasonable persons in the exercise of impartial judgment could not arrive at a contrary verdict." *General American*, 100 F.3d at 899. In deciding such a motion, "the court cannot reweigh the evidence or assess credibility." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1576 (11th Cir.1987); *see also Norton v. Snapper Power Equipment*, 806 F.2d 1545, 1548 (11th Cir.1987). "If rea-

sonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented, the motion should be denied." *Montgomery,* 168 F.3d at 1289; *see also, Harris,* 97 F.3d at 505.

■ A motion for a new trial may only be granted "when the jury's verdict is against the great—not merely the greater—weight of the evidence." *Haygood v. Auto–Owners Ins. Co.,* 995 F.2d 1512, 1514–15 (11th Cir.1993) (quoting *Fondren v. Allstate Ins. Co.,* 790 F.2d 1533, 1534 (11th Cir.1986)); *see also, Redd v. City of Phenix City,* 934 F.2d 1211, 1214 (11th Cir.1991). "This standard is intended to preserve litigants' right to a jury trial and to ensure that judges will not substitute their own judgment for that of the jury with respect to disputed issues of fact." *Haygood,* 995 F.2d at 1515. "[T]he district judge should not substitute his own credibility choices and inferences for the reasonable credibility choices and inferences made by the jury." *Redd,* 934 F.2d at 1215 (quoting *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1498 (11th Cir.1987)) (alteration in original). "When there is some support for a jury's verdict, it is irrelevant what ... the district judge would have concluded." *Redd,* 934 F.2d at 1215.

A. Collective Action

■ The Defendant argues that a collective action was improper in this case because the Plaintiffs were not "similarly situated." The Court addressed this issue prior to trial in response to the Defendant's motion to sever. (*See* Order of November 4, 1997, at 5–6.) In the Order of November 4, 1997, the Court discussed Supreme Court and Eleventh Circuit case-law holding that ADEA plaintiffs have a right to proceed collectively. (*See id.*) (discussing *Hoffmann–LaRoche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *Grayson v. K Mart Corp.,* 79 F.3d 1086 (11th Cir.1996); *Flavel v. Svedala Indus. Inc.,* 875 F.Supp. 550 (E.D.Wis.1994); and *Glass v. IDS Financial Services Inc.,* 778 F.Supp. 1029 (D.Minn.1991)). The Court reiterated its holding that "where there is an ongoing continuous series of discriminatory acts, they may be challenged in their entirety as long as one of the discriminatory acts falls within the limitations period." (Order of November 4, 1997, at 6–7.)

■ In the Order on the Defendant's motion to sever, the Court also incorporated by reference its Order on the Defendant's motion for summary judgment. (*See* Order of November 4, 1997, at 7.) In its Order on the Defendant's motion for summary judgment, the Court stated that age discrimination claims are sufficiently similar to be brought in the same action so long as there are "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." (Order of July 28, 1997, at 8) (quoting *Glass,* 778 F.Supp. at 1080). Using that standard, the Court then stated that the "named filing Plaintiffs' claims are broad enough to encompass the piggybacking Plaintiffs' claims." (Order of July 28, 1997, at 8.) The issue of whether a collective action was proper in this case is one the Court has already addressed. The Defendant has presented the Court with no new argument or authority on this issue, and the Court sees no reason to revisit it.

B. The Temporal and Subject Matter Scope of the Case

The Defendant argues that the Court improperly applied the rule set forth in *Grayson* for determining the temporal and subject matter scope of the evidence to be presented in this action. The Defendant argues that Plaintiffs Agee, Carter, Tuggle, and Lee should have been precluded from the trial, and moves for judgment as a matter of law with respect to their claims. The Defendant argues further that the jury must have been influenced by what the Defendant considers to have been the improper inclusion of evidence regarding Plaintiffs Agee, Carter, Tuggle, and

Lee, and moves on that ground for a new trial on the claims of Plaintiffs Hipp, Stein, and Stell.

The *Grayson* rule allows potential collective action plaintiffs to "piggy-back" on a timely Equal Employment Opportunity Commission [EEOC] charge filed by a named plaintiff, provided that both claims "arise out of similar discriminatory treatment in the same time frame." 79 F.3d at 1102. Although the *Grayson* court did not address the issue of the temporal limits for a collective action, the Defendant argues that the *Grayson* rule requires that only claims arising within the 180 or 300 days (depending on whether the Plaintiff resides in "deferral" or a "nondeferral" state) prior to the filing of the representative charge may be included in a collective action.

In its previous response to the exact same argument by the Defendant, the Court addressed the issue of the proper temporal and subject matter scope of this case at length. (*See* Order of June 29, 1998, at 12–17.) The Court noted that in this case the "Plaintiffs allege a pattern or practice of age discrimination which spans a considerable time period." (Order of June 29, 1998, at 13.) With respect to the argument that Plaintiffs could not recover for discriminatory acts that occurred prior to the opening of the 180/300 day time period, the Court stated:

> The Court is satisfied that Plaintiffs have shown a substantial nexus between the previous alleged discriminatory acts and those which fall within the limitations period. The Plaintiffs allege an orchestrated effort was implemented by Defendant in order to remove District Managers over the age of forty (40). Various witnesses have testified about statements regarding replacement by younger employees and the philosophy that older employees are too resistant to change and too expensive to maintain. There has been testimony regarding the practice of "building a file" on a employee who is targeted to be removed. Moreover, Plaintiffs have provided testimony that, as they became targeted as an employee who should be removed from the company, a file was built on them and a campaign of harassment was instituted until that particular employee was demoted, resigned, constructively discharged, etc. There is evidence that an informal practice or system was in place to accomplish the alleged goals of Defendant. The techniques allegedly utilized by Defendant to accomplish its goals are remarkably the same regardless of the time period referenced. Moreover, this is a pattern or practice case.

(*Id.* at 14–15.)

In the Order of June 29, 1998, the Court also considered the argument, now raised again by the Defendant, that Plaintiffs could not recover for discriminatory acts which took place subsequent to the date on which the representative charge was filed. The Court stated that the Plaintiffs' claims that arose after December 9, 1994, out of the same practice and policy described in Plaintiff Brad Stein's EEOC charge "certainly grow out of the representative charge of discrimination." (Order of June 29, 1998, at 16.) It stated further that "related class claims could be expected to grow out of an EEOC charge alleging class discrimination. If that alleged policy had ceased, there would not have been any 1995–1997 claims. Moreover, since the policy or practice did not cease, it is foreseeable that the additional claims would grow out of the alleged discriminatory policy complained of on December 9, 1994, by Mr. Stein." (*Id.* at 17.)

Finally, in the same Order, the Court addressed the issue, also now raised again, of the subject matter scope of the collective action. The Court held that "the additional charges by the Plaintiffs joining the suit are reasonably related to the charge filed by Plaintiff Stein. All of the Plaintiffs allege age discrimination and contend that the practice was carried out company-wide. Although a few of the decision makers changed over the course of time, for

the most part, the same individuals carried out the alleged discriminatory practice." (*Id.* at 17.)

In sum, the Court has already addressed the issue of the proper temporal and subject matter scope of this case, and rejected all of the arguments the Defendant now raises. The Defendant is not entitled to judgment as a matter of law or a new trial on this ground, because the claims of all Plaintiffs fell within the temporal and subject matter of this collective action, as defined by the representative charge filed by Plaintiff Brad Stein.

## C. Pattern and Practice

The Defendant argues that Plaintiffs did not present sufficient evidence to demonstrate that the Defendant engaged in a pattern and practice of age discrimination. In previously responding to the same argument, the Court discussed at length the evidence the Plaintiffs presented in support of their pattern or practice claim. (Order of July 29, 1998, at 4–10). The Court held that the Plaintiffs had "presented sufficient evidence to establish a *prima facie* case of a pattern or practice of age discrimination," and that this issue was a "question for the jury to decide." (*Id.* at 10).

Moreover, as Plaintiffs rightly point out, the Court excluded further evidence on the policy and practice issue, on the ground that further evidence on that point would be cumulative. The Defendant cannot have it both ways by moving for the exclusion of evidence on a point at trial and arguing post-trial that there was not sufficient evidence on that point. The Defendant is now in the position of having to live with the consequences of having made that strategic decision during trial.

The Defendant also argues that statistical evidence was required to support the Plaintiffs' pattern and practice claim. Again, this is an issue the Court has already addressed. In response to the same argument, the Court held that, despite a lack of statistical evidence, Plaintiffs had presented sufficient direct and circumstan-

tial evidence of discrimination against older workers to establish a *prima facie* case of age discrimination. (Order of June 29, 1998, at 2–10).

Furthermore, the Defendant is hardly in a position to complain about the absence of statistical evidence. At trial, the Plaintiffs sought to introduce statistical evidence based on the data contained in an exhibit the Defendant had introduced. The Defendant then made the Court aware of problems with the its own exhibit, problems that made the evidence inaccurate and unsound. Because of these problems with the data, the Court allowed the Defendant to withdraw the exhibit, and precluded the Plaintiffs from introducing statistics based on it. While the Court declined to impose sanctions on the Defendant for this conduct, this Court is well aware of the reasons for the lack of statistical evidence in this case One of the important factors the Court considered in reaching its decision that sanctions would not be imposed on the Defendant's counsel for the introduction of the flawed evidence was the fact that there was "no indication of prejudice to either party" because of the error. (Order of October 27, 1998, at 3). Should it later turn out that this was an incorrect assumption because the absence of statistical evidence becomes important on appeal, the Court may rethink its determination that sanctions are not warranted in this case.

## D. The Individual Age Discrimination Claims

The Defendant argues that each Plaintiffs' claims must be examined on an individual basis to determine whether each Plaintiff presented sufficient evidence that age was the determining factor in the actions taken against him, and that the Plaintiffs did not present sufficient evidence to establish individual claims. This argument is based on the assumption that the Plaintiffs did not establish a valid pattern and practice claim. As the Court stated above, however, this assumption is

incorrect. Therefore, the Defendant is not entitled to judgment as a matter of law on this basis.

### E. Jury Instructions

■ The Defendant argues that it is entitled to a new trial because the Court erroneously refused to give several jury instructions the Defendant requested. The Defendant argues that the Court's refusal to give the requested jury instructions regarding pattern and practice, constructive discharge, discrimination against others, evidentiary requirements in "rule violation" cases, and mitigation of damages misled the jury. It is error for a Court to refuse to give a proposed instruction "only if the requested instruction is correct, is not adequately covered by the charge given, and deals with a point so important that failure to give the instruction seriously impaired the defendant's ability to present an effective defense." *Adams v. Sewell*, 946 F.2d 757, 767 (11th Cir.1991). Further, while a party is entitled to have the jury instructed on its theory of the case if the evidence supports that theory, "the court is not required to give instructions in the exact language that a party's lawyer desires." *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1349 (11th Cir.1987).

### 1. Pattern and Practice

The Court gave the jury the following instruction regarding the pattern and practice issue:

> Plaintiffs allege that Liberty National engaged in a pattern and practice of age discrimination. "Pattern and practice" is a phrase with special meaning. In order to assert a pattern and practice of age discrimination, Plaintiffs must establish, by a preponderance of the evidence, that age discrimination was Liberty National's standard operating procedure. In order to establish a pattern or practice of age discrimination by Liberty National, Plaintiffs must establish that unlawful age discrimination was Liberty National's regular procedure or policy. In order to determine whether or not a pattern or practice exists, the focus is not in the decisions affecting the individual Plaintiff, but on a pattern of discriminatory decision making which affected the Plaintiffs.

> The burden of proving a pattern and practice always rests with the Plaintiffs. A pattern or practice of discrimination might be demonstrated by examining the discrete decisions of the company, statistical evidence, direct evidence, and circumstantial evidence which evidences a pattern of discriminatory employment decision making. Liberty National may refute the pattern and practice claim by showing that Plaintiffs' evidence is inaccurate or not significant, or by showing that its employment actions were non-discriminatory

(Court's Instructions to the Jury, at 17.)

■ The Defendant argues that this instruction was erroneous in two respects. First, the Defendant argues that this instruction did not give the jury an adequate context for analyzing whether a pattern and practice existed, and that the Court erred by declining to give Defendant's Proposed Instruction 3, which stated as follows:

> The number of instances of discrimination must be significant in relation to the total number of employees. Isolated acts, or acts alleged against different supervisors working in different geographical areas, will not be enough.

(Def.'s First Revised Proposed Jury Instructions.)

■ The decision not to include Defendant's Proposed Instruction 3 was not error, because the instruction as given covered the same point. The instructions the jury heard stated that to show pattern and practice, Plaintiffs were required to "establish, by a preponderance of the evidence, that age discrimination was Liberty National's standard operating procedure" and that "age discrimination was Liberty National's regular procedure or policy." (Court's Instructions to the Jury, at 17.)

Additionally, the instruction given stated that "the focus is not on the decisions affecting the individual Plaintiff, but on a pattern of discriminatory decision making which affected the Plaintiffs." (*Id.*) Where the factors set forth in a proposed instruction are included in the instruction given, even if "in a more generalized form," the refusal to give the proposed instruction is not error. *Ad–Vantage,* 849 F.2d at 1350.

■ Second, the Defendant argues that the instruction given did not explain that, even if there was evidence of pattern and practice, each Plaintiff was still required to prove that he individually was a victim of age discrimination. The Defendant argues that the Court erred by refusing to give the Defendant's Proposed Instruction 5, which states as follows:

> Even if there is abundant evidence of a pattern and practice of age discrimination against District Managers at Liberty National, each and every plaintiff must prove to you by a preponderance of the evidence that he, individually, was an actual victim of age discrimination. In other words, each plaintiff must bridge the gap between his individual claim and the broader claim of a pattern and practice of age discrimination.

(Def.'s First Revised Proposed Jury Instructions) (citations and quotations omitted).

However, the point that, in order to prevail, each Plaintiff had to demonstrate that he individually had been discriminated against was made elsewhere in the jury instructions. For instance, the instruction on constructive discharge stated that "[e]ach Plaintiff must show by a preponderance of the evidence that his working conditions were so difficult or unpleasant that a reasonable person in the Plaintiff's shoes would have felt compelled to resign." (Court's Instructions to the Jury, at 22.) Moreover, the verdict forms required the jury to find on an individual basis whether each Plaintiff had been the victim of age discrimination. The fact that the jury found that the Defendant had engaged in a pattern and practice of age discrimination,

but nonetheless found against several of the Plaintiffs demonstrates that the jury understood the requirement that the Plaintiffs individually prove that age discrimination was a determining factor in the employment actions taken against them.

## 2. Constructive Discharge

■ The Defendant argues that the Court's constructive discharge instruction did not give the jury adequate guidance on the intolerability standard. The Court gave the following instruction on this issue:

> Several Plaintiffs have claimed that they resigned or retired and that they were "constructively discharged" from Liberty National because of their age.
>
> A constructive discharge is not when an employee is actually fired, but when his employer deliberately, because of his age, makes working conditions so intolerable that the employee is forced to resign.
>
> It is not enough to show that the Plaintiff felt he had to resign. Each Plaintiff must prove by a preponderance of the evidence that his working conditions were so difficult that a reasonable person in the Plaintiff's shoes would have felt compelled to resign.

(Court's Instructions to the Jury, at 22.)

The Defendant argues that the Court erred by not giving the following proposed instructions on this issue:

Defendant's Proposed Instruction 14:

> Aggressive and close scrutiny by a new supervisor, even if it includes unfair evaluations and threats of discipline, does not justify someone's quitting and claiming discrimination forced him to quit. A person cannot use age discrimination law as a way to keep his employer from insisting on high standards of performance.

Defendant's Proposed Instruction 15:

> Employers are entitled to make demands of employees and insist on high standards.

Where all employees worked in a pressure-filled environment, no particular employee can claim that difficult work conditions signify the employer's intent to force that individual to resign.

The law does not guarantee a working environment free of stress; rather it protects an employee from discriminatorily motivated, calculated effort to pressure him into resigning by imposing unreasonably harsh conditions, in excess of those faced by his co-workers.

Even when a plaintiff is singled-out for criticism or even specific negative action, such as a demotion or pay cut, that is not enough to prove constructive discharge.

Employees have an obligation not to assume the worst, and not to jump to conclusions too fast. An employee must explore alternatives before resigning.

(Def.'s First Revised Proposed Jury Instructions) (citations and quotations omitted).

■ The instruction given by the Court accurately stated the law regarding constructive discharge. The Eleventh Circuit has stated that showing constructive discharge requires a plaintiff to "demonstrate that working conditions were 'so intolerable that a reasonable person in [his or] her position would have been compelled to resign.'" *Poole v. Country Club of Columbus,* 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Department Stores, Inc.* 116 F.3d 1432, 1433–34 (11th Cir.1997)). The instructions requested by the Defendant would require Plaintiff to go far beyond the showing that is required in the Eleventh Circuit, and are largely based on cases from other circuits that are not binding on this Court. Moreover, they are stated in argumentative terms, more appropriate for closing argument than for jury instructions, which alone is sufficient reason for this Court to reject them. *See Adams,* 946 F.2d at 768.

### 3. Discrimination Against Others

■ The Defendant argues that it was error for the Court to allow witnesses to testify about age-related comments made by Liberty National managers about individuals other than the Plaintiffs, without giving the requested limiting instruction regarding that testimony. The Defendant argues that the Court erred by refusing to give Defendant's Proposed Instruction 21 on this issue, which stated as follows:

You have heard some testimony that someone at Liberty National may have made one or more comments about the age of someone other than the Plaintiffs. Even if you believe that testimony, you may not consider it in deciding whether an individual plaintiff has proven his claim of age discrimination.

(Def.'s First Revised Proposed Jury Instructions).

However, because Plaintiffs proceeded under a pattern and practice theory, this proposed instruction was not an accurate statement of the law. The testimony to which the Defendant refers went to the issue of whether the Defendant engaged in a pattern and practice of age discrimination. In *Teamsters v. United States,* 431 U.S. 324, 360, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court rejected the contention that a finding that an employer had engaged in a pattern and practice of discrimination could not be considered in determining whether the employer had discriminated against an individual plaintiff. The Court was therefore correct in refusing to give the requested instruction.

### 4. Evidentiary Requirements in "Rule Violation" Cases

The Defendant states that Plaintiff Tony Agee was terminated for violating a company rule regarding written receipts. It argues that the Court erred by refusing to give the following proposed instructions with regard to Plaintiff Agee's claim:

Proposed Instruction 18:

Liberty National has offered evidence that it terminated Mr. Agee for violating an established work rule when he gave a customer an unauthorized receipt.

Since Mr. Agee has admitted that he did violate the rule, he bears the burden to prove by a preponderance of the evidence that Liberty National's reason was false, and a pretext for age discrimination. He can only prove pretext by proving that employees younger than 40 also violated the same work rule but were treated less severely by Liberty National.

If Mr. Agee fails to make this proof by a preponderance of the evidence, you must return a verdict in favor of Liberty National on Mr. Agee's claim.

Proposed Instruction 19:

In deciding whether any employee's treatment under Liberty National's work rules can be compared with Mr. Agee, the test is whether Liberty National considered them to be similarly situated. If Liberty National applied a rule differently to people it believed to be differently situated, then there is no proof of discrimination.

If Liberty National was unaware of other violations of the rule, you cannot find discrimination based on those violations.

An employer has the right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.

(Def.'s First Revised Proposed Jury Instructions) (quotations and citations omitted).

Defendant's proposed instructions are based on the test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which, as this Court has already held, is not the appropriate standard in a pattern and practice case. (*See* Order of June 29, 1998, at 2 n. 1). The instruction proposed by the Defendant is therefore not an accurate statement of the law. Further, the Court gave the following instructions:

To carry their ultimate burden of persuasion in an age discrimination case, the Plaintiffs must do more than simply discredit the employer's explanation, and must also present evidence capable of proving that the real reason for the employer's action was discrimination based on age.

. . .

The Age Discrimination in Employment Act specifically permits an employer to discharge or otherwise discipline an individual for "good cause," even if that individual is 40 or older.

(Court's Instructions to the Jury, at 23, 32.) The instructions given state in general terms the same legal principles as are contained in Defendant's requested instruction, without the inaccuracies contained in the Defendant's proposed instructions The Court did not err in refusing to give the instruction requested by the Defendant.

### 5. Mitigation of Damages

The Defendant argues that the instructions given did not provide the jury with adequate guidance on the issue of mitigation of damages. The following instruction was given to the jury on mitigation of damages:

If you find that any Plaintiff is entitled to damages, his back pay award should be limited to proven economic loss. Liberty National must not be held liable for any Plaintiff's losses that were not caused by the Defendant.

In determining whether to award back pay, and if so, the appropriate amount, you must consider whether a Plaintiff made reasonably diligent efforts to limit his damages by seeking employment substantially equivalent to his prior position. Interim earnings which were, or with reasonable diligence could have been, earned by a Plaintiff shall operate to reduce the back pay otherwise allowable.

In order to mitigate damages, it is not necessary that the Plaintiffs seek or accept a position which is different or inferior to the position which they allege they would have retained had they not been discriminated against by Defen-

dant; they are only required to make reasonable efforts to find and to accept a position which is substantially equivalent to the one which they allege they would have received absent Defendant's alleged discriminatory action.

In deciding whether those positions Plaintiffs either turned down or failed to apply for were substantially equivalent to the positions they had, you should consider whether the position under consideration afforded Plaintiffs virtually identical job working conditions, and status as the positions Plaintiffs previously had.

The burden of proving a failure to mitigate damages is on the Defendant, Liberty National Life Insurance Company. To satisfy this burden, the Defendant must establish by a preponderance of the evidence (1) that the damage suffered by Plaintiffs could have been avoided or mitigated, in other words, that there were in fact substantially equivalent positions to the position that they allege they should have retained for which they were qualified, and (2) that the Plaintiffs failed to use reasonable diligence in seeking such a substantially equivalent position.

If Liberty National proves by a preponderance of the evidence that a Plaintiff unreasonably refused a good faith offer of reinstatement and back pay by Liberty National, back-wage damages shall be cut off from the date the offer was refused.

. . .

If Defendant proves that a Plaintiff unjustifiably failed to take a new job of like kind, status and pay which was available to him or failed to make reasonable efforts to find a new job, you should subtract from his damages any amount he could have earned in a new job after his discharge.

(Court's Instructions to the Jury, at 30, 33.) These instructions accurately state the law of the Eleventh Circuit regarding mitigation of damages, as it has been set forth in such cases as *Lathem v. Department of Children and Youth Servs.*, 172

F.3d 786, 794 (11th Cir.1999); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir.1991); and *Walters v. City of Atlanta*, 803 F.2d 1135, 1145 (11th Cir. 1986).

However, the Defendant argues that it was error for the Court to refuse to give the following proposed instructions on the mitigation of damages issue:

Proposed Instruction 26:

If you find that a plaintiff did not make reasonable job search efforts, you may not award him backpay damages. In other words, a plaintiff may not simply abandon his job search and continue to recover back pay. A plaintiff's entitlement to back pay is cut off if the defendant proved he made no reasonable efforts to seek substantially equivalent employment after leaving Liberty National.

Proposed Instruction 27:

A plaintiff's duty to search for substantially equivalent employment is not excused just because he reported frustration, disappointment, or lack of desire to continue working in his field of training. Therefore, if any plaintiff did not seek subsequent work in the insurance industry after leaving Liberty National, you should find that he has not made a reasonable effort to limit his damages, even if he claims he avoided insurance work because of his negative experience at Liberty National.

Proposed Instruction 28:

Any plaintiff who accepted subsequent employment in another industry without first exhausting possibilities in the insurance field has not satisfied his duty to exercise reasonable diligence in searching for suitable post-termination employment. In other words, a plaintiff is not entitled to backpay if he pursued only lower paying positions in an entirely different field of business—that person has failed to exercise reasonable diligence in finding substantially equivalent employment.

A plaintiff also is required to make an effort to find work with substantially equivalent job responsibilities, demands, working conditions, and compensation. If he sought only less demanding jobs with lower pay, his action amounts to a willful loss of earnings, thereby reducing the amount of any award that plaintiff might receive.

Proposed Instruction 29:

After a plaintiff accepts a subsequent job, he must exercise reasonable diligence in maintaining substantially equivalent employment. In other words, after he obtains substantially equivalent work, he must then make reasonable and good faith efforts to retain the job.

If a plaintiff voluntarily quits comparable, interim employment, he fails to exercise reasonable diligence in the mitigation of damages, and his back pay must be decreased by the amount he would have earned had he not quit. For example, a plaintiff's entitlement to backpay is cut off if he voluntarily quits subsequent comparable employment for personal reasons or as a matter of personal convenience.

In addition, a plaintiff's right to backpay also is cut off if he is terminated from subsequent comparable employment for failing to perform his job duties, for failing to produce as expected, or for violating work rules.

Proposed Instruction 30:

If you find that any of the plaintiffs was unable to work for any period of time subsequent to the cessation of their employment with the defendant, that plaintiff is not entitled to receive any back pay or benefits for that time period.

Thus, if any plaintiff was physically unable to perform any job duties at any time after leaving Liberty National, he is not entitled to any award of backpay or other damages during that period of disability.

(Def.'s First Revised Proposed Jury Instructions) (quotations and citations omitted).

■ Several of the Defendant's proposed instructions state that if a Plaintiff did not mitigate his damages, he was not entitled to backpay damages or his entitlement to backpay damages was cut off from the time of his failure to mitigate forward. This is not an accurate statement of the law; instead, the law requires only that the amount a Plaintiff would have earned had he been reasonably diligent in pursuing substantially equivalent alternate employment be deducted from the amount of back pay awarded a Plaintiff who failed to mitigate his damages. *See Walters,* 803 F.2d at 1145; *see also* 42 U.S.C. § 2000e–5(g) (stating that the "amount earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise awardable").

The Court did not err in refusing to give the requested instructions, both because the law on mitigation of damages was adequately covered by the extensive instructions given on that issue, and because the proposed instructions were themselves erroneous. *See Adams,* 946 F.2d at 767. Furthermore, the instructions requested by the Defendant are argumentative, which itself is an independent reason that their exclusion was proper. *See id.* at 768

**F. Admission of Evidence**

Liberty National argues that the admission of time-barred evidence, evidence of discrimination against others, and evidence regarding stray remarks was error, entitling it to a new trial. All of the evidence of which the Defendant complains was admissible in support of the Plaintiffs' pattern and practice claim or to demonstrate that a hostile environment existed in the workplace.

**1. Time–Barred Evidence**

With respect to the evidence the Defendant characterizes as time-barred, the Defendant once again argues that this case should not have proceeded as a collective action, and that the requirements for establishing a continuing violation have not

1334

been met. The Court has already addressed these arguments above and in several previous Orders, and will not do so further here, except to state that the Defendant's argument is without merit.

## 2. Evidence of Discrimination Against Others

 Defendant argues that the admission of evidence regarding discrimination against non-Plaintiffs Woody McKown and Don Whitman and against agent applicants was error and prejudiced the Defendant. With respect to a claim of age discrimination, however, "[t]here is no proscription of evidence of discrimination against other members of the plaintiff's protected class; to the contrary, such evidence may be highly probative, depending on the circumstances." *Shattuck v. Kinetic Concepts, Inc.,* 49 F.3d 1106, 1109 (5th Cir.1995). The instant case is a pattern and practice case, which placed the burden on Plaintiffs to prove by a preponderance of the evidence that the Defendant engaged in age discrimination as a part of its standard operating procedure. Evidence of Defendant's discrimination against others was highly relevant for that purpose, and its probative value was not substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. Admission of that evidence was therefore not error.

## 3. Stray Remarks

 The Defendant argues that it was error to admit evidence of "stray remarks," or discriminatory comments that were not made by a decisionmakers, related to the decisions at issue in this case, close in time to those decisions. The Defendant is correct that "stray remarks" cannot be direct evidence of discrimination. "For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees,* 91 F.3d 1449, 1453 (11th Cir.1996); *see also, Eskra v. Provident Life & Accident Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir.1997).

 However, even statements that cannot be offered as direct evidence of discrimination because they are time-barred or are not directly related to a plaintiff "may provide circumstantial evidence to support an inference of discrimination." *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir.1998); *see also, Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 521 (3d Cir.1997) (stating that "stray remarks by nondecisionmakers may be properly used by litigants as circumstantial evidence of discrimination"). In this case, testimony of what could be considered stray remarks was particularly relevant, because this case is a pattern and practice case. Further, discriminatory remarks, even by non-decisionmakers can "constitute evidence of the atmosphere in which the employment decision was carried out." *Walden,* 126 F.3d at 521. Therefore, it was not error to admit evidence of what the Defendant characterizes as "stray remarks."

## G. Damages

In this case, the verdict form specifically asked the jury whether the Plaintiffs proved "by a preponderance of the evidence that Liberty National's conduct toward [Plaintiffs] was done with knowledge that it was a violation of the Age Discrimination in Employment Act or with reckless disregard as to whether it was a violation of the Age Discrimination in Employment Act." (*See* Verdict Forms.) The jury found that the Defendant's discrimination against all of the successful Plaintiffs was willful. (*See id.*) Nonetheless, the Defendant argues that it is entitled to judgment as a matter of law with respect to the jury's liquidated damages, punitive damages, and pain and suffering verdicts, because there was insufficient evidence to support a finding that the Defendant acted willfully.

 This Court has previously discussed at length the evidence that demonstrates willfulness on the part of the Defendant, particularly evidence demon-

strating that age discrimination was not an isolated occurrence, but was instead a pattern and practice of the Defendant. (*See* Order of June 29, 1998, at 4–10). The Court will not reiterate that earlier discussion here, except to state that the evidence presented by the Plaintiffs "demonstrated that older employees were specifically targeted because of Defendant's decision makers' perceptions of the attitudes, costs, and vulnerabilities associated with their aged employees." (*Id.* at 4.) There was more than sufficient evidence presented in this case to demonstrate that the Defendant acted willfully in violating employment discrimination law.

The Defendant's further arguments on the issue of damages duplicate arguments made in Defendant's motion for remittitur or a new trial on damages Those arguments will be discussed below in connection with that motion.

In sum, the Court has found no error on any of the grounds suggested by Defendant, and no reason to reverse any of its earlier rulings. This case appropriately went forward as a collective action based on a pattern and practice theory. The jury's verdict was supported by substantial evidence in all respects. The instructions given to the jury were accurate as to the law, and Defendant was not entitled to any instructions which were not given. The evidence admitted over Defendant's objection was properly admitted. Therefore, Defendant's motion for judgment as a matter of law or, alternatively, for a new trial, on the issue of liability will be denied.

### III. Motion for Remittitur or a New Trial on Damages (Docket No. 392)

 Defendant moves for remittitur or a new trial as to damages The Defendant argues that the amount of backpay damages awarded to the successful Plaintiffs, the amount of punitive damages awarded to Plaintiff Hipp, and the amount of pain and suffering damages awarded to Plaintiffs Hipp and Stein were excessive. "A grossly excessive award may warrant a finding that the jury's verdict was swayed by passion and prejudice and thus necessitate a new trial." *Goldstein v. Manhattan Indus.,* 758 F.2d 1435, 1447 (11th Cir. 1985). "However, a new trial should be ordered only when the verdict is so excessive as to shock the conscience of the court." *Id.; see also, Carter v. Decision-One Corp.,* 122 F.3d 997, 1006 (11th Cir. 1997). "When the jury's verdict is within the bounds of possible awards supported by the evidence, its award should not be disturbed." *Carter,* 122 F.3d at 1006.

#### A. Backpay

The Defendant argues for remittitur or a new trial on the award of backpay damages on the grounds that: (1) the awards were based on unreliable expert testimony; (2) the damages awarded did not account for the Plaintiffs' failure to mitigate their damages; (3) no backpay should have been awarded to Plaintiffs Lee and Hipp for the periods during which each was incapacitated; (4) any award of backpay to Plaintiff Stein was improper, because he committed a termination offense; and (5) the amounts distributed as lump sum pension and retirement benefits should have been deducted from the backpay awards. The jury awarded the successful Plaintiffs the following amounts as backpay:

| PLAINTIFF | BACKPAY |
|---|---|
| Tony Agee | $191,043 |
| Harold Carter | $227,465 |
| David Hipp | $337,592 |
| James Lee | $673,819 |
| Brad Stein | $403,779 |
| Mike Stell | $196,390 |
| Blake Tuggle | $ 79,742 |

##### 1. Expert Testimony

The Defendant argues that these awards were excessive because they were based on unreliable expert testimony that should have been excluded. At trial, Plaintiffs presented the expert testimony of Marvin Beasley, a C.P.A., regarding their damages. Initially, the Defendant objected to both the testimony and the expert reports prepared by Mr. Beasley. Before Mr. Beasley testified, however, the parties

reached a stipulation that Mr. Beasley's testimony would be admitted, but that the expert reports he prepared would not be offered as evidence, and that the Plaintiffs would offer a chart containing Mr. Beasley's conclusions regarding their damages. Accordingly, the back pay reports were never moved into evidence, and Mr. Beasley's testimony and the chart were offered without any objection from the Defendant. The Defendant offered no testimony or argument regarding damages, stating only in its closing argument with regard to damages that "We're not going to argue with you, because we're saying we don't owe these people a thin dime, a red cent, a copper, a farthing, whatsoever."

Following the trial, the Plaintiffs sought front pay They supported their requests for front pay with front pay reports, also prepared by Mr. Beasley The Court found that the requested front pay awards were unduly speculative, but allowed the Plaintiffs the opportunity to provide the Court with revised front pay reports. (*See* Order of November 20, 1998, at 23.) The Court found that it could not use the revised reports provided by the Plaintiff, because the methods used to calculate front pay were "inaccurate and unsound." (*See* Order of March 11, 1999, at 4–5.)

■ The Defendant now argues that Mr. Beasley's calculations regarding backpay were unreliable, because they used the same flawed methodologies that were used in the front pay reports. Once again, however, the Defendant is hampered by one of its own strategic decisions. The Defendant did not object to Mr. Beasley's testimony at the time that it was offered. Under Eleventh Circuit precedent, the Defendant waived this objection by its failure to object to the expert testimony when it was offered. *See Christopher v. Cutter Laboratories,* 53 F.3d 1184, 1192 (11th Cir. 1995). The statement the Eleventh Circuit made in the *Christopher* case applies equally here:

> What occurred in this case provides a classic example of why contemporaneous objections need to be made. Some of [the expert witness]'s testimony could have been read to be inaccurate and inconsistent, but he was afforded no opportunity to clarify the apparent inconsistencies. If [the defendant] believed that [the expert witness]'s testimony was statistically invalid, it should have objected to that testimony, giving him the chance to explain his answers. Objecting also would have provided the district court with the opportunity not only to make a ruling on the accuracy and admissibility of the challenged testimony but also to clarify that testimony.

*Id.*

■ With no contemporaneous objection having been made to Mr. Beasley's damages testimony, the admission of that testimony can be reviewed only for plain error. *See id.* "Plain errors are obvious and substantial errors which seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Hope,* 901 F.2d 1013, 1020 (11th Cir.1990)). The Court finds no basis in the record to find that the admission of Mr. Beasley's reports regarding backpay was plain error. The Court is not certain that Mr. Beasley's methods of calculating back pay were the best available, although the Defendant's failure to object on that ground has left the Court with no basis on which to properly evaluate that question. However, if erroneous, the admission of Mr. Beasley's testimony was not an error of the magnitude that it could be considered a "substantial error" that seriously affected the proceeding's fairness, integrity or public reputation..

■ This is particularly true given the remedial nature of the claims involved. Consistent with the goals of the ADEA, "[b]ackpay should be awarded even where the precise amount of the award cannot be determined, with any ambiguities being resolved against the employer." *Wooldridge v. Marlene Indus. Corp.,* 875 F.2d 540, 549 (6th Cir.1989); *see also, Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 156 (3d. Cir. 1999). That there was some conjecture

involved in Mr. Beasley's backpay calculations, the Court has no doubt. However, while an award of front pay may be denied where it is overly speculative, Plaintiffs who have proven that they were the victims of age discrimination are unquestionably entitled to backpay, even if there is a certain level of speculation involved.

### 2. Mitigation of Damages

The Defendant argues that the backpay awards did not account for Plaintiffs Lee, Carter, Hipp, and Agee's failure to mitigate their damages. It was the Defendant's burden to establish with respect to each Plaintiff that he failed to mitigate his damages. *See EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1251–52 (11th Cir.1997). "Specifically, the employer must show that 'comparable work was available and the claimant did not seek it out.'" *Weaver v. Casa Gallardo*, 922 F.2d 1515, 1527 (11th Cir.1991) (quoting *Sellers v. Delgado Community College*, 839 F.2d 1132, 1139 (5th Cir. 1988)).

■■ The Defendant presented no evidence at trial demonstrating that substantially equivalent employment was available to any of these Plaintiffs. However, the Defendant argues that the failure of Plaintiffs Lee, Carter, and Agee to seek substantially equivalent employment relieved it of its burden to demonstrate that such employment was available. Where "an employer proves that the employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially comparable employment." *Weaver*, 922 F.2d at 1527 (quoting *Sellers*, 839 F.2d at 1139). In this case, however, the Defendant has not established that these Plaintiffs failed to make reasonable efforts to obtain work.

#### a. Plaintiff Lee

■■ With respect to Plaintiff Lee, the Defendant asserts that "[i]t is undisputed that James Lee did not make reasonable efforts to mitigate his damages." (Def.Mem. at 7), in that Plaintiff Lee has now retired. Plaintiffs, however, vigorously dispute the Defendant's contention, pointing to Plaintiff Lee's testimony that after he left the Defendant's employ, he applied for a license to sell insurance for Protective Life Insurance Company, and solicited a "big case" for that company. (Tr. June 2, 1998, at 170–71.) Plaintiff Lee testified that his efforts to find employment were then hindered for several months by an injury that required surgery and rehabilitation. (Tr. June 2, 1998, at 171.)

The Defendant did not cross-examine Plaintiff Lee about what efforts he made to find another job prior to obtaining a license from Protective Life Insurance Company, about his employment at Protective, or about any other efforts he made to obtain employment in the insurance field or in any other field. Further, that information was not otherwise in the evidence that was before the jury. The fact that Plaintiff Lee's decision to retire, as was reflected in the front pay reports, would have barred him from receiving front pay, is not relevant to the question of the backpay award. No evidence of that decision, the reasons for it, or when it was made, was before the jury. The Defendant did not establish that Plaintiff Lee failed to make reasonable efforts to obtain work, and was therefore not excused from its burden to establish that substantially comparable employment was available to him.

#### b. Plaintiff Carter

■■ The Defendant argues that Plaintiff Carter failed to mitigate his damages, because he pursued only lower-paying positions in other occupations. Plaintiff Carter's testimony was that after he left the Defendant, he looked for work, and worked for a short time as an agent for Smith Murphrey Financial Consultants, then sold radio advertising, then became a truck driver, until he went back into the insurance industry again in 1997. He worked for an insurance company called American General for ten months, until the

end of December 1997. Plaintiff Carter stated that the reason he left American General was because of "what had happened to me with Liberty National. I just never could get over that to where I could put my whole heart into the insurance business again." (Tr. June 15, 1998, at 32.) In January 1998, he went back to being a truck driver until April 1998, when he became a car salesman. The Defendant did not cross-examine Plaintiff Carter regarding what efforts he had made to obtain substantially equivalent employment before he took positions outside the insurance industry.

▮ With respect to the period ending when Plaintiff Carter left American General, the Defendant did not present any evidence establishing that Plaintiff Carter did not make reasonable efforts to seek comparable employment. However, Plaintiff Carter's testimony demonstrates that he voluntarily quit his job at American General at the end of December 1997. The Defendant argues that Plaintiff Carter thus falls within the rule requiring that where "a plaintiff has obtained employment equivalent to that from which he was excluded by the defendant, and quits without adequate reason, the backpay award must be offset by the amount the plaintiff would have earned had he kept the job." *Griffin v. George B. Buck Consulting Actuaries*, 566 F.Supp. 881, 882 (S.D.N.Y. 1983).

▮ The rule on which the Defendant relies, however, does not appear to apply here, because the record does not establish that the position with American General was in fact substantially equivalent to Plaintiff Carter's position with the Defendant. " 'Substantially equivalent employment' is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which [the employee] has been discriminatorily terminated." *Weaver*, 922 F.2d at 1527.

Plaintiff Carter earned $25,441.00 in the ten months that he worked for American General. That rate of pay equates to an annual salary of approximately $30,529.00, or less than half of what Plaintiff Carter made while employed by the Defendant. Further, the only information in the record regarding Plaintiff Carter's position with American General is that American General is an insurance company. There is no evidence as to the promotional opportunities, job responsibilities, or working conditions available to Plaintiff Carter in that position. Hence, Plaintiff Carter's position with American General was clearly not substantially equivalent to his position with the Defendant in terms of pay, and it is impossible to determine from the record whether that position was substantially equivalent in other respects.

▮ The rule that does apply to Plaintiff Carter's case was stated in *Weaver*, in which the Eleventh Circuit held that it is not a failure to mitigate for plaintiff who is unable to find substantially equivalent employment to " 'lower his sights' and accept noncomparable employment." 922 F.2d at 1527. The *Weaver* court stated further that where a plaintiff has accepted noncomparable employment, he is not required to remain in the position despite dissatisfaction with it. *See id.*

Moreover, even if the rule for which the Defendant argues did apply in this case, its application would not appear to help the Defendant. Plaintiff Carter's change of employers from American General to the trucking company appears to have *increased* Plaintiff Carter's rate of pay. At an annual salary of approximately $30,-529.00. Plaintiff Carter would have earned approximately $587.00 per week at American General. Plaintiff Carter's earnings as a truck driver ranged from $287.00 to $905.00 per week, averaging approximately $617.00 per week. To offset the backpay award by the amount Plaintiff Carter would have earned had he remained with American General, as the Defendant argues should be done, rather than with the amount he actually earned as a truck driver, would actually increase

the amount of backpay to which Plaintiff Carter is entitled, surely not the result the Defendant seeks.

### c. Plaintiff Agee

Finally, the Defendant argues that Plaintiff Agee failed to pursue employment in the insurance industry. After he left the Defendant's employ, Plaintiff Agee sold insurance to federal employees, then worked as a mortgage broker, finally becoming a salesman for an oil company. Without pointing to any evidence that Plaintiff Agee failed to seek employment in the insurance industry, the Defendant argues that Plaintiff Agee did not satisfy his duty to exercise reasonable diligence in seeking subsequent comparable employment. The Court was unable to find any such evidence in the record to support Defendant's argument. It was Defendant's burden to establish that Plaintiff Agee failed to mitigate, and it did not meet that burden

### 3. Periods of Incapacitation

 Plaintiff Lee testified that in the time after he left the Defendant's employ, he was unable to work for several months due to an injury that required surgery and rehabilitation. There was also evidence that Plaintiff Hipp required surgery that prevented him from working full time after he no longer worked for the Defendant. The Defendant argues that backpay should not have been awarded during these periods, because these Plaintiffs were not physically capable of performing their job duties during their periods of incapacitation. Back pay damages are generally available only for periods during which a plaintiff was " 'available and willing to accept substantially equivalent employment' elsewhere; courts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the back pay award." *Lathem v. Department of Children and Youth Servs.*, 172 F.3d 786, 794 (11th Cir.1999) (quoting *Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir.1985)).

 Plaintiffs point out, however, that evidence was presented at trial that the among the benefits provided by the Defendant was short term disability and wage continuation insurance. Had Plaintiffs Lee and Hipp remained in the Defendant's employ, they would have received their wages and benefits during their respective periods of incapacitation. It would be inconsistent with the "purpose of relief under the federal employment anti-discrimination laws," which " 'is to make persons whole for injuries suffered on account of unlawful employment discrimination,' " *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1251 (11th Cir. 1997), (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–19, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)), to deny backpay during periods of incapacitation, when the Plaintiffs would have been compensated during those periods had they remained in the Defendant's employ.

### 4. Commission of a Termination Offense

 The Defendant argues that under the rule stated in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), Plaintiff Stein is not entitled to backpay damages. In *McKennon*, the Supreme Court considered the effect on an ADEA suit of an employer's learning, after the suit begins, of misconduct that would have led to an employee's termination if the employer had known about it previously. The Court held that after-acquired evidence of wrongdoing does not bar an ADEA suit, but may affect the remedies available to the plaintiff. *See id.* at 359–360, 115 S.Ct. 879. It stated that as a general rule neither reinstatement nor front pay would be appropriate in such a case. *See id.* at 361–62, 115 S.Ct. 879. Back pay, however, would still be available, but might be limited:

> The beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered. In determining the appropriate order for relief,

the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party. *Id.* at 362, 115 S.Ct. 879. Before an employer can "rely on after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee would in fact have been terminated on those grounds alone if the employer had known about it at the time of the discharge." *Id.*

■ The Defendant states that Plaintiff Stein committed a termination offense while still employed by the Defendant. Several months prior to Plaintiff Stein's resignation, he became licensed to sell insurance for Commercial Insurance Consultants [CIC] The Defendant points to testimony of Plaintiff Hipp that even before Plaintiff Stein left his job with the Defendant, Plaintiff Stein spent several hours per week working for CIC. (*See* Tr. June 10, 1998, at 69–70.) The Defendant's Field Procedure Manual states that engaging in another occupation and applying for a license to sell insurance with another company are both termination offenses. Further, the Defendant's assistant general counsel in his trial testimony confirmed that violation of these rules would result in termination. (*See* Tr. June 24, 1998, at 37–40) The Defendant has demonstrated that Plaintiff Stein's offense would have led to his termination if it had known of it.

Under the rule in *McKennon*, the Defendant is thus entitled to rely on the after-acquired evidence of Plaintiff Stein's misconduct. Because no front pay was awarded in this case, the application of that portion of the *McKennon* rule has no effect on Plaintiff Stein's recovery. With respect to backpay, the starting point of this Court's analysis must be to limit the award of backpay to the period from the date of Plaintiff Stein's discharge to the date the Defendant discovered Plaintiff Stein's misconduct. *See McKennon*, 513 U.S. at 362, 115 S.Ct. 879. It is unclear from the record before the Court when the Defendant learned of Plaintiff Stein's licen-

sure by CIC. However, the Court need not resolve that issue, because the next step of the analysis is determinative in this case.

According to *McKennon*, a trial court may take into account "extraordinary equitable circumstances that affect the legitimate interests of either party" where after-acquired evidence limits the recovery for age discrimination. *Id.* The Court finds that such extraordinary circumstances are present here The Court has exhaustively reviewed the caselaw that has followed *McKennon*. Employers that have successfully argued for limitation of backpay due to after-acquired evidence of wrongdoing have offered evidence of conduct such as: stealing confidential documents, *see McKennon*, 513 U.S. at 355, 115 S.Ct. 879; stealing and destroying the employer's property; *see O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir.1996); committing plagiarism, *see Castle v. Rubin*, 78 F.3d 654, 658 (D.C.Cir. 1996); falsely denying having been convicted of a drug offense on an employment application, *see Wallace v. Dunn Construction Co.*, 62 F.3d 374, 377 (11th Cir.1995); and sexually harassing a subordinate employee, *see Ricky v. Mapco, Inc.*, 50 F.3d 874, 875 (10th Cir.1995).

■ In contrast, although the actions Plaintiff Stein took were a violation of company rules, they would not otherwise have been wrongful. More importantly, the actions were an effort by Plaintiff Stein to mitigate his damages. Plaintiff Stein testified that he did not sell any policies for CIC while still employed by the Defendant. He signed the contract with CIC before he left the Defendant's employ because he was told that if he was going to join, it had to be then. He stated that he took the opportunity when it was offered because he knew he was leaving the Defendant. (*See* Tr. June 4, 1998, at 245–46.) Plaintiff Stein would not have needed to find other employment, and, therefore, would not have had reason to work for CIC, had it not been for the Defendants' unlawful discrimination. These

factors take Plaintiff Stein's case out of the ordinary. They also persuade the Court that the jury's award of backpay to Plaintiff Stein should not be disturbed. It would not be fair to penalize Plaintiff Stein and benefit the Defendant because of actions caused directly by the Defendant's unlawful conduct

The Defendant further argues, based on statements contained in documents entered in evidence as an exhibit, that Plaintiff Stein failed to mitigate his damages, because he failed to produce enough business, and was fired from CIC. However, the Defendant neglects to mention that its contention is directly contradicted by Plaintiff Stein's testimony, which was that he was not fired, and that his employment with CIC ended because CIC ended the entire program. (*See* Tr. June 4, 1998, at 246). The jury was offered conflicting evidence, and was given the instructions discussed above regarding mitigation of damages. The Court sees no reason to reverse the jury's apparent resolution of this conflict in the evidence.

### 5. Lump Sum Pension and Retirement Benefits

The Defendant argues that the lump sum pension and retirement benefits received by Plaintiffs should be deducted from the amount of backpay awarded to them. The Defendant states that "[f]ederal courts uniformly agree that lump sum pension, profit sharing, and retirement payments issued to employees upon termination must be deducted as an offset against any backpay award owed to an employment discrimination plaintiff." (Def.Mem. at 11) (citing *Brunnemann v. Terra Int'l*, 975 F.2d 175, 179 & n. 7 (5th Cir.1992); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 966 (4th Cir.1985); *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 77–78 (2d Cir.1983); *EEOC v. Northwest Airlines*, 1987 U.S.Dist. LEXIS 14942, at *2–3 (W.D.Wash. Nov. 9, 1987)). As an initial matter, the Court would point out that Defendant's statement misrepresents the state of the law, overstates the holdings of the cases it describes, and ignores Elev-

enth Circuit caselaw that, while not directly on point, is closely related. The Court has no way of knowing whether this inaccuracy reflects a deliberate attempt to mislead the Court or is merely the result of sloppy research, but neither is acceptable to this Court.

The Eleventh Circuit has not addressed the issue of whether pension benefits must be deducted from backpay awarded to employment discrimination plaintiffs. The federal courts that have addressed this issue appear to be split. *Compare Brunnemann*, 975 F.2d at 179 & n. 7 (pension benefits deducted); *Fariss*, 769 F.2d at 966 (same); *Hagelthorn*, 710 F.2d at 78; *Northwest Airlines*, 1987 U.S.Dist LEXIS 14942, at *2–3 (same), *with Smith v. World Ins. Co.*, 38 F.3d 1456, 1465–66 (8th Cir. 1993) (pension benefits may not be deducted from backpay as a general rule, but may be deducted where backpay award includes "employer pension contributions payments which would have been made. but for the unlawful discharge"), *EEOC v. O'Grady*, 857 F.2d 383, 389 (7th Cir.1988) (district court has discretion to offset pension benefits or not) *McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214, 217 (3d Cir. 1984) (pension benefits not deducted from backpay award), *rev'd on other grounds*, 469 U.S. 1202, 105 S.Ct. 1159, 84 L.Ed.2d 312 (1985). This split appears to be part of a larger division among the circuits over the issue of "whether collateral benefits should be subtracted from backpay awards in employment discrimination cases." *Lussier v. Runyon,* 50 F.3d 1103, 1107 (1st Cir.1995) (stating that circuits are split on the collateral benefits issue and collecting cases).

While the Eleventh Circuit has not ruled on the precise issue before this Court, it has decided the issue of whether collateral benefits generally may be deducted from backpay awards in employment discrimination cases. In *Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549, 1550 (11th Cir.1983), the Eleventh Circuit held that deduction of unemployment benefits

in employment discrimination cases "should be consistently disallowed" More recently, the Eleventh Circuit extended this holding to include Social Security benefits *See Dominguez v. Tom James Co.*, 113 F.3d 1188, 1191 (11th Cir.1997). In *Dominguez*, the Eleventh Circuit stated that it "agree[d] with the position of the Third Circuit in *Maxfield [v. Sinclair International*, 766 F.2d 788 (3d Cir.1985).]" *Dominguez*, 113 F.3d at 1191. In *Maxfield*, the Third Circuit stated that the reasoning for disallowing the deduction of unemployment benefits, Social Security benefits, and pension benefits from backpay was the same, stating that:

> there are no significant discernable differences between Social Security benefits and pension benefits for this purpose. All would ordinarily be received by an employee ... only after s/he has been discharged or involuntarily retired.... [W]e see no reason why the benefit of the collateral funds should shift to the defendant. The quotation relied on in *McDowell* is equally applicable here:
>
> > Since no consideration has been given or should be given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received.
>
> *NLRB v. Gullet[t] Gin Co.*, 340 U.S. [361,] 364[, 71 S.Ct. 337, 95 L.Ed. 337 (1951)] (*quoted in McDowell*, 740 F.2d at 217–18) (footnote omitted). As between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer

*Maxfield*, 766 F.2d at 795.

█ Far from there being the "uniform rule" described by the Defendant, numerous federal courts have held that pension benefits may not be deducted from backpay awards in employment discrimination cases. While the Eleventh Circuit has not addressed this precise issue, it has clearly come down on the side of disallowing the deduction of collateral benefits from backpay awards with respect to Social Security and unemployment benefits In doing so, it has endorsed reasoning that would apply the same rule to pension benefits. This Court agrees with the reasoning of the Third Circuit with regard to pension benefits being indistinguishable from Social Security and unemployment benefits for purposes of a backpay award, and predicts that the Eleventh Circuit will do so as well, if it has not already done so implicitly with its holding in *Dominguez*.

█ In any event, even if the rule for which the Defendant argues were the law of this circuit, it is not clear that it would apply in this case. The pensions of all of the Plaintiffs had already vested. Defendant would have been required to pay Plaintiffs their pensions upon retirement, even if it had not discriminated against them. Further, the pension benefits to which Plaintiffs would have been entitled by that point would have been significantly larger than the amounts the Plaintiffs actually received. The backpay awarded to the Plaintiffs did not include any components to account for the pension payments the Defendant would have had to pay if it had not unlawfully discriminated against Plaintiffs. To deduct the amount of the pension benefits from the backpay awarded would therefore provide a "windfall" to the Defendant, in effect rewarding the Defendant for its discrimination. The award of backpay to the Plaintiffs will not be reduced by the amount of pension benefits paid out to them.

In sum, neither a new trial nor a remittitur is necessary with regard to the award of backpay, because the jury's award of backpay was within the bounds of possible awards supported by the evidence. The amount awarded closely correlated with the figures provided by Plaintiffs' expert witness. Further, Plaintiffs offered as evidence voluminous financial records, and each Plaintiff testified regarding his economic losses. Even without the expert

**1343**

testimony, the documents and testimony would have provided a basis for the amount awarded to the Plaintiffs. It was the Defendant's burden to establish that the Plaintiffs failed to mitigate damages, and the Defendant failed to carry that burden. The Defendant is not entitled to have the award reduced to account for the periods during which Plaintiffs Hipp and Lee were incapacitated, because those Plaintiffs would have been compensated during those periods had they remained in the Defendant's employ. Because of the equities involved, the award of backpay to Plaintiff Stein will not be limited to account for after-acquired evidence of misconduct by Plaintiff Stein. Finally, the amounts Plaintiffs received as lump sum distributions of their pension benefits will not be deducted from the award of backpay.

B. Punitive Damages

■ The jury awarded Plaintiff Hipp punitive damages in the amount of $5,000,-000.00. Consistent with Florida's statutory cap on punitive damages awarded under the Florida Civil Rights Act [FCRA], Florida Statutes Section 760.11(5), this Court has already reduced the amount of this award of punitive damages to $100,000.00. (*See* Order of March 11, 1999, at 9.) The Defendant now argues that the award of punitive damages should be set aside entirely or reduced even further. The Defendant argues, based on *Kolstad v. American Dental Ass'n*, 139 F.3d 958 (D.C.Cir. 1998), that punitive damages should have been awarded only if Plaintiff Hipp had demonstrated "egregious conduct" toward him on the part of the Defendant. Although that case is a Title VII case and the award of punitive damages was made with respect to Plaintiff Hipp's FCRA claim, "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998).

■ However, the authority on which the Defendant relies has since been reversed by the Supreme Court. *See Kolstad v. American Dental Ass'n*, — U.S. —, 119 S.Ct. 2118, — L.Ed.2d — (1999). The Supreme Court stated in *Kolstad* that to be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 2124. While the Court recognized that "[c]onduct warranting punitive awards has been characterized as 'egregious' because of the defendant's mental state," it held that there is no requirement that "employers must engage in conduct with some independent 'egregious' quality before being subject to a punitive award." *Id.* at 2126.

■ The jury found in this case that the Defendant's conduct toward Plaintiff Hipp "was done with knowledge that it was a violation of the Age Discrimination in Employment Act or with reckless disregard as to whether it was a violation of the Age Discrimination in Employment Act." (Verdict Form for David Hipp, at 4). This is sufficient to meet the standard set forth by the Supreme Court in *Kolstad* for an award of punitive damages. Further, the Court would note that the evidence presented at trial would have been sufficient to demonstrate that the Defendant had engaged in "egregious conduct," if that had in fact been the applicable standard. This Court has already reduced the award of punitive damages to $100,000.00; Defendant's motion to further reduce or set aside this award will be denied.

The Court must also express its concern with the fact that, here again, the Defendant has misrepresented the state of the law on this issue. The Defendant represents in its brief that *Kolstad* explains that "federal courts uniformly agree that punitive damages cannot be awarded unless evidence of the defendant's culpability exceeds a mere showing of intentional discrimination." (Def.Mem. at 12–13.) Instead, the case on which the Defendant

relies explicitly recognizes that there is a split in the circuits on this issue, stating that while four circuits had up to that point "held that egregious misconduct beyond mere intent to discriminate is required for punitive damages ... [t]hree other circuits have held that a finding of intentional discrimination, without more, is enough to put the question of punitive damages before the jury." *Kolstad*, 139 F.3d at 962. The Court would emphasize again to Defendant's counsel its displeasure with misrepresentations to this Court.

## C. Pain and Suffering Awards

The Defendant moves for remittitur or a new trial with respect to the pain and suffering awards to Plaintiffs Hipp and Stein. The jury awarded Plaintiff Hipp $1,175,000.00 and Plaintiff Stein $2,700,000.00 for their pain and suffering, pursuant to those Plaintiffs' FCRA claims. The Defendant argues that the evidence presented at trial was insufficient to support these awards.

Florida state law governs the substantive question of whether the verdict in this case is excessive, while federal law governs the "slightly different procedural question" of whether the Defendant is entitled to a new trial if the damages are found to be excessive. *Lowe v. General Motors*, 624 F.2d 1373, 1383 (5th Cir.1980); *see also Hattaway v. McMillian*, 903 F.2d 1440, 1450 (11th Cir.1990). The rule in Florida is that "[t]he court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed. The verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Bould v. Touchette*, 349 So.2d 1181, 1184 (Fla.1977); *see also, Ashcroft v. Calder Race Course*, 492 So.2d 1309, 1314 (Fla.1986). "[W]here the evidence on the issues ... is in conflict, and the verdict found thereon is not manifestly against the weight of the evidence, the court will not interfere and set aside the verdict of the jury." *Wackenhut Corp.*

*v. Canty*, 359 So.2d 430, 434 (Fla.1978). "In other words, the trial judge does not sit as a seventh juror with veto power.... Not every verdict which raises a judicial eyebrow should shock the judicial conscience." *Id.* Likewise,

> Although a verdict may be for considerably more or less than in the judgment of the court it ought to have been, still the court should decline to interfere, unless the amount is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake. In order to shock the sense of justice of the judicial mind the verdict must be so excessive or so inadequate so as to at least imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like.

*Lassiter v. International Union of Operating Eng'rs*, 349 So.2d 622 (Fla.1996).

Under this standard, the Court finds that it cannot set aside or reduce the award of pain and suffering damages to Plaintiffs Stein and Hipp. The amount might be larger than the Court itself would have awarded, but given the evidence the jury heard as to the effect that the Defendant's discrimination had on these Plaintiffs, it was within the reasonable range in which the jury could operate. There is no implication from the verdict that the jury was influenced by prejudice or improper motive. For these reasons, the Court will deny the Defendant's motion for remittitur or a new trial as to the award of pain and suffering damages Accordingly, it is:

**ORDERED** that:

1. Plaintiff's motion for attorneys' fees (Docket No 390) be **DEFERRED;** and will be considered only after all appeals are resolved, if necessary;

2. Defendant's motion for remittitur or for a new trial on the issue of damages (Docket No. 392) be **DENIED;** and

3. Defendant's motion for judgment as a matter of law or for a new trial and supporting memorandum (Docket No. 394) be **DENIED.**